**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| TALLY PERSONNEL LLC; TALLY PRODUCTION SYSTEMS, LLC; EPIC LIFT SYSTEMS LLC; PRIORITY ARTIFICIAL LIFT SERVICES LLC <br><br> Plaintiffs, <br><br> v. <br><br> LIBERTY LIFT SOLUTIONS, LLC; DANIEL MURSKI; JEREMY CRANK <br><br> Defendants. | Case No. _____ <br><br> **COMPLAINT** <br><br> JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiffs Tally Personnel LLC ("Tally Personnel"), Tally Production Systems, LLC ("Tally Production Systems"), Epic Lift Systems LLC ("Epic"), and Priority Artificial Lift Services LLC ("Priority") (collectively "Tally"), by and through its attorneys, for its Complaint against Defendants Liberty Lift Solutions, LLC ("Liberty"), Daniel Murski ("Murski"), and Jeremy Crank ("Crank") (collectively, "Defendants") allege as follows:

### THE PARTIES

1.      Tally Personnel is a limited liability corporation organized under the laws of Delaware and has a principal place of business at 14345 Northwest Freeway, Houston, TX 77040.

2.      Tally Production Systems is a limited liability corporation organized under the laws of Texas and has its principal place of business at 14345 Northwest Freeway, Houston, TX 77040.

3.      Epic is a limited liability corporation organized under the laws of Texas and has its principal place of business at 14345 Northwest Freeway, Houston, TX 77040.

4.      Priority is a limited liability corporation organized under the laws of Texas and has its principal place of business at 14345 Northwest Freeway, Houston, TX 77040.

5.      On information and belief, Liberty is a limited liability corporation organized under the laws of the State of Delaware, with a principal place of business located at 16420 Park Ten Place #300, Houston, Texas 77084.

6.      On information and belief, Liberty may be served with process through its registered agent for service of process: Registered Agent Solutions, Inc., Corporate Center One, 5301 Southwest Parkway, Suite 400, Austin, TX 78735.

7.      On information and belief, Murski is an individual and has a place of residence at 407 Tuscany Drive, Victoria, Texas 77904.

8.      On information and belief, Crank is an individual and has a place of residence at 314 Clearwood Drive, Fort Worth, Texas 76108.

## JURISDICTION AND VENUE

9.      This action arises under the Defend Trade Secret Act of 2016, 18 U.S.C. §§ 1836, *et seq*. ("DTSA"), the Texas Uniform Trade Secret Act, Tex. Civ. Prac. & Rem. Code § 134A.001 ("TUTSA"), the Texas Harmful Access by Computer Act, Tex. Civ. Prac. & Rem. Code § 143.001, the Lanham Act 15 U.S.C. 1125, and Texas common law.

10.     This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 because this action arises under the Defend Trade Secret Act of 2016, 18 U.S.C. §§ 1836, *et seq*., Declaratory Judgment Act, 28 U.S.C. §§ 2201, and/or the Lanham Act 15 U.S.C. 1125 §43(a). This Court has supplemental jurisdiction over the state law causes of action pursuant to 28 U.S.C. § 1367 because the facts giving rise to those claims form the same case or controversy as those relating to claims deriving subject matter jurisdiction from 28 U.S.C. §§ 1331.

11.     Liberty is subject to this Court's personal jurisdiction because it has its principal place of business in the state of Texas at 16420 Park Ten Place #300, Houston, Texas 77084. Liberty is further subject to this Court's personal jurisdiction because many of the acts giving rise to this Complaint took place in Texas and in this district. For example, on information and belief, the disclosure of trade secrets by Murski to Liberty and the use of those trade secrets by Liberty occurred in the Southern District of Texas. On information and belief, Liberty was put on notice of both Murski's and Crank's confidential relationship in the Southern District of Texas and chose to misappropriate the trade secrets anyway. On information and belief, the advertising that is the subject of the Lanham Act claims was developed at Liberty's headquarters in the Southern District of Texas and was provided to customers by Liberty.

12.     Murski is subject to this Court's personal jurisdiction because, on information and belief, he resides in the state of Texas at 407 Tuscany Drive, Victoria, Texas 77904.

13.     Crank is subject to this Court's personal jurisdiction because, on information and belief, he resides in the state of Texas at 314 Clearwood Drive, Fort Worth, Texas 76108.

14.     Venue is proper in this district under 28 U.S.C. §§ 1391(b)(1) because, on information and belief, Liberty resides in the Southern District of Texas and all other Defendants are residents of Texas. Liberty's principal place of business is in the Southern District of Texas, and Liberty is subject to personal jurisdiction in Texas as set forth above, thereby making Liberty a resident of this district under 28 U.S.C. § 1391. Because Murski and Crank are residents of Texas, venue is proper in this District. Alternatively, venue is proper in this district under 28 U.S.C. §§ 1391(b)(1) because, on information and belief, Murski (another defendant) resides in this district (at 407 Tuscany Drive, Victoria, Texas 77904) and all other Defendants are residents of Texas.

15.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because, as set forth above, a substantial number of the events or omissions giving rise to the claims occurred in this district.

## BACKGROUND

### I.   Tally

16.     Tally delivers oil and gas recovery solutions that are designed to improve operations while reducing costs for its clients. Tally's solutions are built on a thorough understanding of subsurface complexity and operators' financial goals combined with strong execution.

17.     One category of technologies and services offered by Tally is artificial lift solutions such as plunger lift, gas lift, and hydraulic jet pumps solutions. Plunger lift and gas lift systems are described in more detail below.

### A.  Plunger Lift[1]

18.     As gas wells mature, a decrease in downhole pressure occurs. For gas wells, the pressure difference between downhole and the surface is used to provide force to carry liquids—such as produced water, oil, and condensate—to the surface. A similar phenomenon of high pressure downhole as compared to low pressure at the surface causes the iconic gushing oil wells:[2]

---

[1]    *See generally*, *The Defining Series: Plunger Lift*, SLB, Oct. 11, 2016, https://www.slb.com/resource-library/oilfield-review/defining-series/defining-plunger-lift.

[2]    *See* Barnett Bros., *The Southern, no. 3 of Jennings*, 1902, https://www.loc.gov/pictures/item/2018662335/.



19.     A decrease in downhole pressure equates to less force being available to carry liquids to the surface. Without sufficient force, liquid may accumulate downhole, creating a condition known as "liquid loading." Liquid loading can cause gas flow to become intermittent and, if left unaddressed, to stop altogether.

20.     To deal with this problem, "artificial lift" may be used to remove accumulated liquids and restore regular gas flow. Artificial lift refers to using man-made (*i.e.*, artificial) techniques to remove (*i.e.*, lift) downhole liquids to the surface. As discussed below, under the umbrella of artificial lift, there are several technologies that may be used.

21.     Plunger lift is an artificial lift method that offers an economical and established technique for removing liquids from aging gas wells. Production engineers consider plunger lift to be one of the simplest forms of artificial lift, because it uses the well's own energy to remove accumulated liquids and sustain gas production—albeit with man-made assistance.



22.     The figure above[3] shows the main components of a plunger lift system on an onshore gas well. Subsurface components may include a plunger (including a bypass valve), a bottomhole bumper spring, and a standing valve (which prevents fluids from flowing out of the bottom of the tubing). Surface components are attached to the wellhead and may include a motor valve that has a solar-powered controller. Relevant here, a lubricator and catcher assembly accepts the plunger as it rises through the wellhead, opening a flow path for the produced gas to the

---

[3] *See The Defining Series: Plunger Lift*, SLB, Oct. 11, 2016, https://www.slb.com/resource-library/oilfield-review/defining-series/defining-plunger-lift.

flowline. The catcher assembly shown in the figure above is manually operated and serves to trap the plunger in the lubricator until the catcher is released. However, automatic systems connected to the controller are known as "autocatch" systems. A plunger autocatch may be actuated pneumatically or electrically. Electrically actuated autocatch systems are known as "eCatch" systems.

**B.  Gas Lift**[4]

23.     Gas lift systems are another form of artificial lift. Gas lift systems work by injecting high-pressure gas from the casing annulus into fluids that have entered the production tubing from the formation. The injected gas reduces the fluid density and, thus, the hydrostatic pressure of the fluid, allowing the existing reservoir pressure to lift the lightened liquids.

24.     This is accomplished using "gas lift valves." These valves allow operators to adjust the rate of gas injection into the liquid column in the production tubing. Check valves within the gas lift valves allow flow in only one direction—typically from the casing annulus into the production tubing. A gas lift valve is typically staged as deeply in the well as possible. This location, also called the setting depth, is limited by available injection pressure. Injection pressure-operated gas lift valves are designed to open typically in reaction to a specified gas pressure in the casing annulus.

25.     Additional gas lift valves may be placed at various depths between the bottom-most valve and the surface. These valves are used primarily at the start of production to reduce the density of the fluid that has risen above the primary point of gas injection at the deepest set valve. This process is referred to as well kickoff or well unloading. Typically, the operating valve is the bottommost valve. Production pressure-operated gas lift valves, placed at various depths in the

---

[4] *See generally*, *The Defining Series: Gas Lift*, SLB, July 29, 2016, https://www.slb.com/resource-library/oilfield-review/defining-series/defining-gas-lift.

well, may open in response to a preset level of pressure exerted by the produced fluid column. They remain closed unless the well experiences an increase in fluid in the tubing, at which point they open to assist in lifting the excess fluid from the well.

### C. Tally's Corporate Structure

26.     Tally Energy Services LLC is a limited liability corporation organized under the laws of the Cayman Islands and has its principal place of business at 14345 Northwest Freeway, Houston, TX 77040.

27.     Tally USA LLC is a limited liability corporation organized under the laws of the state of Delaware and has its principal place of business at 14345 Northwest Freeway, Houston, TX 77040. Tally USA LLC is a wholly owned subsidiary of Tally Energy Services LLC. Tally USA LLC has several wholly owned subsidiaries of its own. Of relevance to this suit, Tally Personnel LLC and Tally Production Systems are wholly owned subsidiaries of Tally USA LLC.

28.     Tally Personnel is responsible for hiring and contracting with Tally's employees. Tally Personnel has service agreements with the other Tally entities (including for example, Tally Production Systems, Priority, and Epic) for providing the services of Tally's employees to those entities. This advantageously allows Tally's employees to perform work for any Tally entity while maintaining their employment with Tally Personnel. Legacy master services agreements with Tally's customers often remain in place with Tally subsidiaries for multiple years after Tally acquires a company—*e.g.*, Priority and Epic. Thus, Tally employees may do work on the same day for multiple Tally entities—those with legacy customer master services agreements as well as for Tally Production Systems, which manages new customer master services agreements. Tally Personnel also enters into other agreements with Tally employees, including, for example, Tally's Confidentiality, IP Assignment, and Non-Interference Agreement.

29.     Tally Production Systems is primarily responsible for providing production technologies and services to Tally's customers. This includes Tally's artificial lift business. Tally offers a focused lineup of artificial lift services, which include providing parts and/or equipment, equipment installation, production optimization, troubleshooting, production analysis, nodal analysis, well modeling, consulting engineering, training, and manufacturing. Although Tally maintains legacy contracts between its customers and other Tally entities, as these contracts come up for renewal, new contracts are made with Tally Production Systems.

30.     Tally designs and sells equipment for artificial lift systems. As described above, artificial lift describes the process of using man-made assistance to remove liquids from a well (as opposed to using *only* the natural pressure difference between downhole and the surface to remove the liquids).

31.     Among other things, Tally designs and sells eCatch equipment for use in plunger lift systems. For example, Tally sells an Electronic Auto Catch (the "Tally EAC"):[5]



---

[5]     Tally, *Introducing the Electronic Auto Catch (EAC)*, July 17, 2023, https://www.tallyenergy.com/press-media/introducing-the-electronic-auto-catch/.

32.     As another example, Tally designs and sells gas lift systems, including gas lift valves for those systems:[6]



**D.  Tally's Acquisitions of Epic and Priority**

33.     Tally has become a leader in the artificial lift market in part by seeking out talent and investing in its business through acquisitions of other leaders in the artificial lift space. For example, Epic and Priority were both companies acquired by Tally that represent significant investments by Tally in its artificial lift business. Today, both Epic and Priority are wholly owned subsidiaries of Tally Production Systems.

34.     On February 28, 2019, Tally expanded its artificial lift services through the acquisition of Epic. This acquisition established Tally as a major provider of artificial lift services in the United States with extensive field service, applications engineering, product development, product sales, and manufacturing capabilities. The Epic team's intense focus on customer service,

---

[6] Tally, *Tubing Retrievable Valves*, https://www.tallyenergy.com/gas-lift-tubing-retrievable-valves/.

leading technical talent, and capabilities in manufacturing have been a major differentiator in the market as Tally offers solutions to increase production while lowering operating expenses. Tally maintains some legacy contracts between Epic and Tally's customers. As previously discussed, as these legacy contracts come up for renewal, new contracts with Tally's customers are made with Tally Production Systems.

35.     Tally acquired Priority on September 6, 2019. Priority had a great reputation in the artificial lift market even before joining Tally. Since 2012, Priority has delivered top quality, professional oilfield services using highly experienced personnel and state of the art equipment Priority also developed and sold its own products. Priority was established with the idea of creating a service company that uses new, state-of-the-art equipment coupled with handpicked, highly-experienced personnel to ensure that customers receive the high quality, professional service expected. Priority designed and sold artificial lift equipment and its acquisition expanded Tally's capabilities to do the same. Today, Tally maintains legacy contracts between Priority and some Tally customers. As previously discussed, as these contracts come up for renewal, new contracts are made with Tally Production Systems.

**E.  The Tally Trade Secrets**

36.     Over time and through significant investment, Tally developed proprietary and confidential information—including trade secrets. Relevant to this action, Tally's trade secrets include at least the following, individually and in combination, (collectively, the "Tally Trade Secrets"):

- challenges in designing valves for artificial lift systems and/or designs for such valves;

- challenges in designing eCatch systems for artificial lift systems and/or designs for such systems;

- solutions for challenges in designing valves for artificial lift systems and/or designs for such valves;

- solutions for challenges in designing eCatch systems for artificial lift systems and/or designs for such systems;

- identities of customers experiencing issues with Tally artificial lift systems and the nature of those issues;

- know-how related to solutions for design challenges concerning valves for artificial lift systems;

- know-how related to solutions for design challenges concerning eCatch systems for artificial lift systems;

- identities of suppliers concerning certain parts for eCatch systems for artificial lift systems;

- know-how related to undesirable or unimplemented approaches or design details concerning valves for artificial lift systems;

- know-how related to the cause of issues that can interfere with the operation of artificial lift systems;

- know-how related to undesirable or unimplemented approaches or design details concerning eCatch systems for artificial lift systems.

37.     Each category of Tally Trade Secrets is commercially valuable to Tally because of its secrecy. For example, in the hands of a competitor like Liberty, one or more of these trade secrets would allow the competitor to get to market more quickly and have a higher quality competing solution than it would have had in the absence of its use of the trade secrets.

38.     Tally has made reasonable efforts to protect its trade secret information. For example, employees are required to sign Tally's Confidentiality, IP Assignment, and Non-Interference Agreement. *See e.g.*, Exhibits 1 and 2. That agreement includes a confidentiality provision that restricts the employee's ability to access and use Tally's confidential information, including trade secrets, and wherein the employee promises to maintain the confidentiality of that information. Additionally, Tally enters into non-disclosure agreements with suppliers before Tally

shares its confidential and proprietary documents and materials with such third parties. Tally also takes additional steps to protect the Tally Trade Secrets. For example, upon learning that Crank was working for Liberty, Tally sent Crank a letter reminding him of his obligations to Tally with respect to Tally's confidential information—including providing Crank with copies of Crank's Confidentiality, IP Assignment, and Non-Interference Agreement with Tally Personnel as well as Crank's Nondisclosure & Developments Agreement with Epic. As another example, after learning that Murski was working for Liberty, Tally sent Liberty a copy of Murski's Confidentiality, IP Assignment, and Non-Interference Agreement with Tally Personnel.

39.     None of the Tally Trade Secrets is publicly available nor, on information and belief, can they be determined through public means.

## II.     Liberty Lift Solutions, LLC

40.     Liberty is a competitor with Tally in the artificial lift market.

41.     On information and belief, Liberty was formed in 2012 to focus on the reciprocating rod lift market. Today, Liberty's products include beam pumping units, XL long-stroke units, gas lift, jet pumps, plunger lift, sucker rods, downhole pumps, pc pumps, and automation.

42.     Of relevance to this suit, Liberty employs at least two former Tally employees: Daniel Murski ("Murski") and Jeremy Crank ("Crank"). On information and belief, Murski is employed by Liberty as Regional Operations Manager. On information and belief, Crank is employed by Liberty as Plunger Lift Automation Manager.

## III.    Daniel Murski

43.     Priority hired Murski in 2017. On information and belief, before working for Priority, Murski had no known oil and gas services experience. Tally fully trained Murski in every technical aspect of the business, including but not limited to at least certain aspects of the confidential and proprietary trade secret information discussed above. Murski was promoted and

eventually named South Texas Manager for Tally. As a result of his employment, Murski had access to the Tally Trade Secrets.

44.     On April 23, 2020, Murski and Tally Personnel mutually agreed to Tally's Confidentiality, IP assignment, and Non-Interference Agreement (the "Tally-Murski Agreement"). This agreement specifically addressed the receipt and disclosure of confidential trade secret information:

> 2. <u>Confidential Information.</u> The Company agrees that, in the course of Employee's employment with the Company, it shall provide Employee with, and provide Employee with access to, Confidential Information that is in addition to any Confidential Information that Employee may have previously received as of the date that Employee enters into this Agreement.
>
> (a)   <u>Confidential Information</u>. For purposes of this Agreement, **"Confidential Information" means** any and all confidential and proprietary information and materials, as well as all **trade secrets**, belonging to the Company, its affiliates, its customers, or other third parties who furnished such information, materials, and/or trade secrets to the Company with reasonable expectations of confidentiality. Confidential Information includes without limitation and regardless of whether such information or materials are expressly identified or marked as confidential or proprietary, and whether or not patentable:
>
> . . .

Exhibit 1, at 1 (empahasis added).[7]

45.     The Tally-Murski Agreement further provided that Murski was obligated to maintain the confidentiality of the Confidential Information (including trade secrets):

> (b) <u>Protection of Confidential Information</u>. In return for the Company's promise to provide Employee with Confidential Information and access to such Information, **Employee promises to keep the Confidential Information, and all documentation and information relating thereto, strictly confidential**.
>
> . . .

*Id.*, at 2.

---

[7] All emphasis is added unless otherwise noted.

46.     Tally made clear to Murski the value of its Confidential Information with respect

to its business:

> (e) <u>Value and Security</u>. **Employee understands and agrees that all Confidential Information constitutes valuable intellectual property of the Company**, its affiliates, its customers, and/or third parties (as applicable), and **is valuable in the business in which the Company is engaged**, Employee further acknowledges the importance of maintaining the security and confidentiality of the Confidential Information.

*Id.*, at 3.

47.     The Tally-Murski Agreement further stated that Murski had a duty of loyalty

because of Murski's "position of special trust and confidence":

> 1. **<u>Duty of Loyalty</u>**. Employee acknowledges that the business of the Company and its affiliates, which includes the provision of products and services relating to drilling, completion, and production of wells, is highly competitive. Employee agrees that **Employee will be employed in a position of special trust and confidence** in which Employee will have responsibility and opportunities in addition to those he or she would have if he or she did not enter into this Agreement. Employee acknowledges and agrees that Employee owes Company a duty of loyalty and that the obligations described in this Agreement are in addition to, and not in lieu of, the obligations Employee owes the Company under the common law and applicable statutes. Employee agrees that Employee will put the Company's business interests before Employee's business interests for so long as Employee remains employed by the Company.

*Id.*, at 1.

48.     The Tally-Murski Agreement also obligated Murski to assign any inventions

related to Tally's business to Tally:

> 3. <u>Inventions, Discoveries, Copyrights, and Company Property</u>.
> (a) All written materials, records, data, and other documents prepared or obtained by Employee in the course of Employee's employment (whether during business hours and whether on Company premises or otherwise) are the Company's property. Additionally, all information, ideas, concepts, improvements, discoveries, and inventions that are conceived, made, researched, developed, or acquired by Employee individually or in conjunction with others during Employee's employment (whether during business hours and whether on Company premises or otherwise) which result from use of equipment, facilities, or information of the Company or relate to the Company's business, products, or services must be promptly disclosed to Company and are the Company's sole and

exclusive property. (All of the foregoing is referred to in this Agreement as "Company Intellectual Property".) All memoranda, notes, records, files, correspondence, drawings, manuals, models, specifications, computer programs, maps, and all other documents, data, or materials of any type embodying such Company Intellectual Property are the Company's property.

. . .

**Further, Employee agrees to and does hereby assign to Company or its nominee his/her entire right title, and interest in and to all such Company Intellectual Property**, as well as any U.S. and international applications for patent or copyright registration thereon **during and subsequent to his/her employment**. Employee agrees to assist Company during and subsequent to his/her employment in every legal way in obtaining, at Company's expense, protection for such inventions and copyrightable materials.

*Id.*, at 3.

49.     Finally, the Tally-Murski Agreement obligated Murski to return all Tally Company Property to Tally:

(f) Obligation to Return All Company Property. Immediately upon the Company's written request at any time or upon the termination of Employee's employment with the Company for any or no reason (without it being necessary for the Company to make any request or demand), **Employee will deliver to the Company** (and will not keep in his possession or deliver to any other person or organization) **any and all Confidential Information and other documents, equipment, or property belonging to the Company**. Employee agrees that Employee shall furnish, within 3 days of receiving written request from the Company, written confirmation that Employee has returned to the Company all of its property, including without limitation all Confidential Information.

*Id.*, at 3.

50.     During late 2020, during his employment with Tally, Murski first discussed certain design aspects of gas lift valves used in Tally's artificial lift systems with another Tally employee, Rusty Brown ("Brown"). As part of his conversation with Brown, Murski disclosed to Tally an invention, that he implied was his idea, whereby he proposed changes to Tally's gas lift valves intended to improve the seals for the valves (the "Tally Valve Seal Invention"). Murski pushed for implementation of the Tally Valve Seal Invention throughout early 2021. Thereafter, Tally proceeded to perform an analysis and experimented with various design aspects relating to the gas

lift valves at issue. In June 2021, Tally issued a design revision for gas lift valves and implemented a solution for the gas lift valves that was different from the Tally Valve Seal Invention. But Tally chose to keep the Tally Valve Seal Invention confidential as a trade secret, as it represented a future option that Tally could choose to implement. Pursuant to the Tally-Murski Agreement, title to the Tally Valve Seal Invention was assigned to Tally. Tally did not give Murski permission to use the Tally Valve Seal Invention for any purpose nor to disclose it to any third party.

51.     On June 17, 2022, Murski gave his notice of resignation from Tally. Murski represented to Tally that he was going to leave the oilfield and return to College Station, Texas to work at a family business. Tally would later learn that Murski made a false representation regarding his future employment. Murski would instead go on to work for Liberty.

52.     On June 20, 2022, based upon his false representation, Murski was allowed to continue to work from home using his Tally-issued computer to finalize customer invoicing for the month. On July 1, 2022, Murski was formally terminated from Tally.

53.     After Murski was terminated, Tally employees noticed Tally-issued computer which Murski returned had very few files on its hard drive. This surprised the Tally employees—especially given Murski's role in operations management at Tally. Tally investigated and determined that documents were missing from Murski's Tally-issued computer. The missing documents were the property of Tally and should have been returned when Murski departed from the company.

54.     In addition, it was known to others at Tally that Murski used an external hard drive to store backup copies of important Tally documents, such as customer install sheets. A customer install sheet describes the components and component locations in the wellbore of Tally's gas lift valves and other gas lift system components. Customer install sheets are important to Tally's

17

customers and, by extension, Tally, at a minimum because they allow customers to understand the current arrangement of valves and their respective configurations, without needing to pull the entire assembly out of the well. This allows customers to make decisions for the installation of future systems without interrupting production. The kind of information included on a customer install sheet might be, by way of example, the number of tubing joints between valves, the length between joints, the pressure at which the valves are set, the pressure at which the valves open, and the pressure at which the valves close.

55.     After Murski departed Tally, no one at the company was able to locate the external hard drive. The external hard drive and its contents (including the missing customer install sheets) were the property of Tally and should have been returned when Murski departed the company.

56.     On information and belief, Murski, without authorization or permission, deleted multiple proprietary Tally documents and files from his Tally-issued computer and/or external hard drive. In particular, on information and belief, the deleted documents and files included customer install sheets for artificial lift systems for which Murski had the only known copies in the possession of Tally. Examples of missing customer install sheets include those for at least seven different Tally customers.

57.     Around August 2022, Tally became aware that Murski was working for its competitor, Liberty.

58.     On August 22, 2023, a Tally customer informed Tally that it would be testing Liberty's new gas lift valve with a "double barrier." Around September 2023, the same customer informed Tally that Liberty was disparaging Tally's products based on confidential information and the Tally Trade Secrets that Murski was aware of only due to his work for Tally. Further, Tally was informed that Murski was using to create bids for Liberty a special bid sheet created in Excel

that Tally used to create bids while Murski was employed by Tally (the "Tally Excel Bidsheet"). On information and belief, Murski took the custom bid sheet with him when he left Tally.

59.     On information and belief, Liberty did not develop its new gas lift valve until Murski began working for Liberty.

60.     On information and belief, around middle to late 2023, Murski called multiple Tally customers to disparage Tally's valves for artificial lift systems and claimed that Murski had produced a solution to those design challenges. Murski was well aware at the time that Murski himself was the cause of some of the issues that had arisen with Tally's valves. Yet Murski led customers to believe that Tally's valves had problems that warranted purchasing valves from Liberty instead. On information and belief, Tally lost one or more jobs to Liberty as a direct result of Liberty and Murski's misappropriation of the Tally Trade Secrets and Murski's false disparagement of Tally's valves.

61.     In January 2024, a "Sneak Peek" article in the American Oil & Gas Reporter included an article describing a new "Robust Gas Lift Valve" from Liberty. *See* Exhibit 4. The article quoted Murski and revealed multiple Tally Trade Secrets, including one or more that were being used in Liberty's product. Based upon the description of the Liberty valve, Tally recognized that Liberty used the Tally Valve Seal Invention. Moreover, the article indicated that a patent application had been filed that presumably included the double barrier that was one aspect of the Tally Valve Seal Invention. Tally did not give permission to Murski or Liberty to include confidential information of Tally and/or the Tally Trade Secrets in a patent application. Nor did Tally give permission to Murski or to Liberty to use the Tally Valve Seal Invention.

## IV.     Jeremy Crank

62.     Crank was hired by Epic in February 2018 as a Sales Representative. Eventually Crank was promoted to Automation Product Line Manager. As a result of his employment at Tally, Crank had access to the Tally Trade Secrets.

63.     On February 10, 2018, Crank and Epic mutually agreed to a Nondisclosure & Developments Agreement (the "Epic-Crank Agreement"). This agreement specifically addressed Crank's obligations with respect to the receipt and disclosure of confidential trade secret information:

1. Confidential Information.

(a) Employee acknowledges and agrees that in the course of his employment with Company, he shall be given access to and **become acquainted with substantial Confidential Information** and goodwill of Company, and shall in the future contribute to such Confidential Information. This Agreement is entered into, and acknowledged to be necessary, to protect such Confidential Information and goodwill.

(b) Employee agrees that Employee shall not, either during Employee's employment with Company, any of its subsidiaries or any parent or holding company of Company (Company and each such subsidiary, parent and holding company, a **"Related Company"** and collectively, the **"Related Companies"**) or at any time thereafter, except as required in the performance of Employee'\"s services for a Related Company, (i) use any Confidential Information in any manner whatsoever, (ii) disclose or divulge any Confidential Information, except to the extent required by law (but only after Employee has provided Company with reasonable notice and opportunity to take legal action against such legally required disclosure) or (iii) remove or aid in the removal from the premises of any Related Company any Confidential Information or any property or material relating thereto.
                                            . . .
(e) For the purposes of this Agreement**, "Confidential Information" means all trade secrets** and all other information of a business, financial, marketing, technical or other nature relating to the business of any Related Company including, without limitation, **any customer or vendor lists**, prospective customer names, financial statements and projections, know-how, pricing policies, operational methods, methods of doing business, technical processes, formulae, **designs and design projects**, inventions, computer hardware, software programs, business plans and projects pertaining to any Related Company and including any information of others that any Related Company has agreed to keep confidential;

provided, that Confidential Information shall not include any information that has entered or enters the public domain through no fault of Employee.

Exhibit 3, at 1.

64.     On April 15, 2020, after Tally had purchased Epic, Crank and Tally Personnel

mutually agreed to Tally's Confidentiality, IP assignment, and Non-Interference Agreement (the

"Tally-Crank Agreement"). This agreement also specifically addressed the receipt and disclosure

of confidential trade secret information:

> 2. Confidential Information. The Company agrees that, in the course of Employee's employment with the Company, it shall provide Employee with, and provide Employee with access to, Confidential Information that is in addition to any Confidential Information that Employee may have previously received as of the date that Employee enters into this Agreement.
>
> (a)  Confidential Information. For purposes of this Agreement, **"Confidential Information" means** any and all confidential and proprietary information and materials, as well as all **trade secrets**, belonging to the Company, its affiliates, its customers, or other third parties who furnished such information, materials, and/or trade secrets to the Company with reasonable expectations of confidentiality. Confidential Information includes without limitation and regardless of whether such information or materials are expressly identified or marked as confidential or proprietary, and whether or not patentable:
>
> . . .

Exhibit 2, at 1.

65.     The agreement further provided that Crank was obligated to maintain the

confidentiality of the Confidential Information (including trade secrets):

> (b) Protection of Confidential Information. In return for the Company's promise to provide Employee with Confidential Information and access to such Information, **Employee promises to keep the Confidential Information, and all documentation and information relating thereto, strictly confidential**.
>
> . . .

*Id.*, at 2.

66.     Tally made clear the value of its Confidential Information with respect to its

business:

(e) <u>Value and Security</u>. **Employee understands and agrees that all Confidential Information constitutes valuable intellectual property of the Company**, its affiliates, its customers, and/or third parties (as applicable), and **is valuable in the business in which the Company is engaged**, Employee further acknowledges the importance of maintaining the security and confidentiality of the Confidential Information.

*Id.*, at 3.

67.     The Tally-Crank agreement further stated that Crank had a duty of loyalty because

of his "position of special trust and confidence":

1. <u>Duty of Loyalty</u>. Employee acknowledges that the business of the Company and its affiliates, which includes the provision of products and services relating to drilling, completion, and production of wells, is highly competitive. Employee agrees that **Employee will be employed in a position of special trust and confidence** in which Employee will have responsibility and opportunities in addition to those he or she would have if he or she did not enter into this Agreement. Employee acknowledges and agrees that Employee owes Company a duty of loyalty and that the obligations described in this Agreement are in addition to, and not in lieu of, the obligations Employee owes the Company under the common law and applicable statutes. Employee agrees that Employee will put the Company's business interests before Employee's business interests for so long as Employee remains employed by the Company.

*Id.*, at 1.

68.     The Tally-Crank Agreement also obligated Crank to assign any inventions related

to Tally's business to Tally:

3. <u>Inventions, Discoveries, Copyrights, and Company Property</u>.

(a) All written materials, records, data, and other documents prepared or obtained by Employee in the course of Employee's employment with Company (whether during business hours and whether on Company premises or otherwise) are the Company's property. Additionally, all information, ideas, concepts, improvements, discoveries, and inventions that are conceived, made, researched, developed, or acquired by Employee individually or in conjunction with others during Employee's employment (whether during business hours and whether on Company premises or otherwise) which result from use of equipment, facilities, or information of the Company or relate to the Company's business, products, or services must be promptly disclosed to Company and are the Company's sole and exclusive property. (All of the foregoing is referred to in this Agreement as "Company Intellectual Property".) All memoranda, notes, records, files, correspondence, drawings, manuals, models, specifications, computer programs, maps, and all other

documents, data, or materials of any type embodying such Company Intellectual Property are the Company's property.

. . .

**Further, Employee agrees to and does hereby assign to Company or its nominee his/her entire right title, and interest in and to all such Company Intellectual Property**, as well as any U.S. and international applications for patent or copyright registration thereon **during and subsequent to his/her employment**. Employee agrees to assist Company during and subsequent to his/her employment in every legal way in obtaining, at Company's expense, protection for such inventions and copyrightable materials.

*Id.*, at 3.

69.     Finally, the Tally-Crank Agreement bound Crank to return all Tally company property to Tally:

(f) Obligation to Return All Company Property. Immediately upon the Company's written request at any time or upon the termination of Employee's employment with the Company for any or no reason (without it being necessary for the Company to make any request or demand), **Employee will deliver to the Company** (and will not keep in his possession or deliver to any other person or organization) **any and all Confidential Information and other documents, equipment, or property belonging to the Company**. Employee agrees that Employee shall furnish, within 3 days of receiving written request from the Company, written confirmation that Employee has returned to the Company all of its property, including without limitation all Confidential Information.

*Id.*, at 3.

70.     As part of his employment with Tally, Crank worked with a supplier ("Supplier A") on development of an eCatch system. Before this work, Epic and Supplier A had mutually agreed to a Confidentiality/ Nondisclosure Agreement on March 11, 2015.

71.     On November 12, 2021, Crank provided Supplier A with a drawing of the Tally Plunger Catcher to assist with design of the eCatch system. Crank also provided Supplier A with Tally's requirements for the eCatch system. On December 16, 2021, Crank checked on progress with Supplier A, who reported that it would be testing using a Tally lubricator that Supplier A had on-site. On information and belief, Crank provided Supplier A with the Tally lubricator.

72.     On October 20, 2022, Crank received a quote from Supplier A for an eCatch system.

73.     On November 1, 2022, a Tally employee Connor Johnson ("Johnson") contacted Crank to discuss a part number request for eCatch systems from Supplier A. Crank responded on November 2, 2022 that the eCatch systems from Supplier A were the fastest and only option to support a specific bid to a Tally client in West Texas. On November 4, 2022, Johnson responded that he understood that Tally was proceeding with a 25-unit order of eCatch systems for testing purposes. On the understanding that the eCatches from supplier A were for testing purposes. Johnson agreed to process the order under a non-stock Purchase Order and canceled the new part number request. On January 11, 2023, Johnson informed the team that he had set up a part number for the incoming eCatch system from Supplier A after all, and that the previous non-stock purchase order had been changed to an inventory purchase order. After receiving an eCatch system from Supplier A, Tally collected feedback from multiple Tally employees with customer responsibilities to understand actual or potential customer reaction to the proposed eCatch system. Based upon that feedback, Tally decided there were flaws in the design of the eCatch system from Supplier A.

74.     On information and belief, Crank provided Supplier A with the feedback on the eCatch systems from Supplier A. On February 27, 2023, an additional purchase order was issued to Supplier A for 20 additional eCatch Systems.

75.     In parallel, Tally decided that due to deficiencies in the eCatch system from Supplier A, Tally would develop a different eCatch system. On July 24, 2023, the first Tally eCatch systems were completed and shipped to the field with only the control boards provided from Supplier A (Tally produced the mechanical system). On October 20, 2023, additional Tally eCatch

systems were completed with design revisions and a control board from a different supplier (not Supplier A).

76.     Crank left Tally on January 26, 2024. On information and belief, Crank was hired by Liberty before resigning from Tally. Tally learned that Crank was employed by Liberty and subsequently sent a letter to Crank on February 5, 2024 explaining Crank's obligations with respect to Tally's confidential information—including the Tally Trade Secrets. Later, a copy of this letter was provided to Liberty, so that Tally could be assured that Crank received a copy. Thus, Liberty was aware of Crank's confidentiality obligations.

77.     On information and belief, Liberty did not market or sell an eCatch system before hiring Crank.

78.     On March 6, 2024, Liberty's Plunger Lift Product Line Manager, Clint Garret ("Garret"), forwarded to Crank's Tally email address, Jeremy.Crank@tallyenergy.com, a meeting invite with the subject of "Plunger Lift Meeting, [Customer A] / Liberty Lift." Garret subsequently followed up in a second email to the same email address with presentation materials apparently discussed in that meeting. *See* Exhibits 5 and 6.

79.     On information and belief, this meeting occurred on Wednesday, March 6, 2024 at 12:00 PM Central time and included representatives from Liberty and a Liberty customer, Customer A. On information and belief, the presentations attached to the second email were for Liberty sales employees to present to customers and prospective customers—*e.g.*, Customer A. Indeed, the second email specifically showed the presentations were shared with email addresses using the domain name for Customer A.

80.     The metadata of Exhibit 5 (the "2023 PDF") shows it was created in 2023.

Exhibit 5 (showing document metadata). Exhibit 5 does not include an eCatch option. *See generally id.*

81. However, Exhibit 6 (the "2024 PDF"), sent in the same email, was created in 2024.



Exhibit 6 (showing document metadata). Exhibit 6 advertises an eCatch product called "LE-Catch Liberty Electric Actuator for Auto-Catch."

82.     Crank's Tally email address was copied on the first email relating to the meeting and on the second email sharing the presentations. On information and belief, Crank is (and has been) involved in the development of Liberty's eCatch system. Thus, it is reasonable to infer that Liberty is now offering its eCatch system using the Tally Trade Secrets and/or other confidential Tally information. Just as Liberty did not have a double barrier valve seal before Murski arrived at Liberty, Tally has seen no evidence that Liberty had an eCatch solution before Crank arrived at Liberty. The differences between the two PowerPoint presentations (Exhibits 5 and 6) strongly suggest that it was Crank who brought an eCatch system to Liberty.

83.     On information and belief, Crank shared the identity of Supplier A with Liberty.

84.     The 2024 PDF included the image below advertising the "LE-Catch Liberty Electric Actuator for Auto-Catch":



Exhibit 6, at 11.

85.     On information and belief, the eCatch system depicted above was developed using the Tally Trade Secrets. The data provided on the slide closely matches the characteristics of Tally's eCatch system.

86.     Additionally, the design of the lubricator structure depicted in the excerpt from the document above is identical to the Tally lubricator structure and inconsistent with the design of the Liberty lubricator structure. The lubricator is highlighted on the slide from the 2024 PDF below.



Exhibit 6, at 11 (annotated).

87.     Liberty lubricators were shown two slides earlier in the same 2024 PDF:



*Id.*, at 9 (annotated).

88.    Upon comparison with engineering drawings of a Tally lubricator (example below), it is apparent that the lubricator depicted in the 2024 PDF is a Tally lubricator, and not a Liberty lubricator:



89.    On information and belief, Liberty is working with Supplier A to develop its "LE-Catch Liberty Electric Actuator for Auto-Catch" product. On information and belief, the engineering drawing shown in the 2024 PDF came from Supplier A. Alternatively, on information and belief, the engineering drawing shown in the 2024 PDF came from Crank. On information and belief, Liberty, with the assistance of its employee Crank, misappropriated the Tally Trade Secrets concerning Tally's eCatch system.

90.    On information and belief, Liberty knows that the lubricator system shown in the 2024 PDF is not something that it has available for sale or has ever sold.

### COUNT I (ALL DEFENDANTS):
### Trade Secret Misappropriation Under the Defend Trade Secret Act

91.    Tally incorporates by reference the allegations in Paragraphs 1-90 above.

92.     The plaintiffs for this claim are Tally Production Systems, Tally Personnel, Epic, and Priority. The defendants for this claim are Liberty, Murski, and Crank.

93.     Tally owns and maintains confidential and proprietary information related to the Tally Trade Secrets described above.

94.      The Tally Trade Secrets comprise information that is not generally known or readily ascertainable through proper means by persons who are not subject to confidentiality obligations to Tally. The Tally Trade Secrets are of significant competitive value to Tally because they are not generally known. Further, the Tally Trade Secrets relate to Tally's artificial lift products, which are offered nationwide and are within the flow of interstate commerce.

95.     Tally has taken and continues to take reasonable measures to protect the confidentiality of the Tally Trade Secrets. For example, employees are required to sign Tally's Confidentiality, IP Assignment, and Non-Interference Agreement. The agreement includes a confidentiality provision that restricts the employee's ability to access and use Tally's confidential information, including the Tally Trade Secrets, and wherein the employee promises to maintain the confidentiality of that information. Tally also enters into non-disclosure agreements with suppliers before Tally shares its confidential and proprietary documents and materials with these third parties.

96.     Tally derives independent economic value from maintaining the Tally Trade Secrets as confidential and proprietary. For example, Tally's relationship with certain suppliers with respect to its artificial lift business was not known by Tally's competitors and therefore set Tally apart in the marketplace and provided Tally with a competitive advantage in making and winning bids for artificial lift projects. Tally's competitors would gain significant economic value from the disclosure or use of the Tally Trade Secrets. For example, Liberty, a Tally competitor, is

using the Tally Trade Secrets to appear innovative. *See e.g.*, Exhibit 4. This unfairly bolsters Liberty's reputation at the expense of Tally. By short-cutting the design and development process using the Tally Trade Secrets, Liberty entered the improved gas lift valve market before it would have otherwise been able to do so.

97.     Defendants Murski and Crank (the "Individual Defendants") had access to the Tally Trade Secrets when they worked for Tally.

98.     On information and belief, the Individual Defendants misappropriated Tally's Trade Secrets because they have disclosed and used the Tally Trade Secrets without Tally's consent, having used improper means to obtain them. In particular, and on information and belief, in using Tally's Trade Secrets in connection with their work for Liberty, the Individual Defendants breached their respective agreements with Tally. In these agreements, these defendants acknowledged a continuing obligation to maintain the confidentiality of Tally's trade secret and proprietary information. Despite acknowledging these obligations, on information and belief these defendants have provided this information to Liberty and further used the Tally Trade Secrets to the benefit of Liberty in performing their job responsibilities for Liberty.

99.      Liberty economically benefited from the Tally Trade Secrets provided by the Individual Defendants. In addition, on information and belief, in their use of the Tally Trade Secrets, the Individual Defendants were subject to the oversight and under the control of others within Liberty, including at least their immediate supervisors. In addition, executives within Liberty had the ability to supervise and exercise control over the work performed by the Individual Defendants on behalf of Liberty. Liberty is therefore liable for the trade secret misappropriation performed by its employees (the Individual Defendants) under at least the doctrine of *respondeat superior*.

100.     In addition, or in the alternative, on information and belief, Liberty also misappropriated the Tally Trade Secrets because Liberty acquired the Tally Trade Secrets from the Individual Defendants and either knew or had reason to know that the information provided by the Individual Defendants included and/or was based on the Tally Trade Secrets and was acquired by theft or breach of the Individual Defendants' respective duties to maintain secrecy. For example, on information and belief, Liberty submitted bids and bid information (in competition with Tally) based on the Tally Trade Secrets, provided directly or indirectly by the Individual Defendants. Liberty thus knew or should have known that these bids included information beyond that available to Liberty before it hired the Individual Defendants. Liberty also knew that the Individual Defendants had previously worked at Tally before coming to work for Liberty and would have acquired Tally's confidential information under circumstances giving rise to a duty to maintain the secrecy of the information. Accordingly, Liberty knew or should have known that its bids and bid information was derived from or otherwise contained the Tally Trade Secrets, and that such trade secret information was obtained without authorization and through improper means from Tally.

101.     Defendants' ongoing and continuing use of Tally's proprietary, confidential trade secret information has caused, and will cause, Tally repeated and irreparable injury. Tally's remedy at law is not, by itself, adequate to compensate Tally for the injuries already inflicted and further threatened by Defendants.

102.     The Defendants have willfully and maliciously misappropriated trade secrets of Tally and used them for their economic gain.

103.     Tally has been damaged by all the foregoing and is entitled to an award of damages, exemplary damages, and attorneys' fees. Liberty and the Individual Defendants have been unjustly enriched by their misappropriation and Liberty is entitled to recover for this unjust enrichment.

104.     By engaging in the conduct set forth above, Defendants have violated the Defend Trade Secret Act of 2016, 18 U.S.C. §§ 1836, *et seq.*

### COUNT II (ALL DEFENDANTS):
### Violation of Texas Uniform Trade Secret Act, Tex. Civ. Prac. & Rem. Code § 134A.001 *et seq.*

105.     Tally incorporates by reference the allegations in Paragraphs 1-104 above.

106.     The plaintiffs for this claim are Tally Production Systems, Tally Personnel, Epic, and Priority. The defendants for this claim are Liberty, Murski, and Crank.

107.     All Defendants have misappropriated the Tally Trade Secrets in violation of the Texas Uniform Trade Secret Act, Tex. Civ. Prac. & Rem. Code § 134A.001 et seq. The Tally Trade Secrets contain information that is not generally known or readily ascertainable through proper means by persons who could use it for economic gain. This information contained in the Tally Trade Secrets is of significant competitive value to Tally because it is not generally known.

108.     Defendants' ongoing and continuing use of Tally's proprietary, confidential trade secret information has caused, and will cause, Tally repeated and irreparable injury. Tally's remedy at law is not, by itself, adequate to compensate Tally for the injuries already inflicted and further threatened by Defendants.

109.     The Defendants have willfully and maliciously misappropriated trade secrets of Tally and used them for their economic gain.

110.     Tally has been damaged by all the foregoing and is entitled to an award of damages, exemplary damages, and attorneys' fees. Liberty and the Individual Defendants have been unjustly enriched by their misappropriation and Liberty is entitled to recover for this unjust enrichment.

111.     By engaging in the conduct set forth above, Defendants have violated the Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code §§ 134A.001 et seq.

**COUNT III (LIBERTY AND MURSKI):**
**Declaratory Judgment of Patent Application Ownership**

112.     Tally incorporates by reference the allegations in Paragraphs 1-111 above.

113.     The plaintiff for this claim is Tally Personnel. The defendants for this claim are Liberty and Murski.

114.     There exists an actual, ripe, and justiciable controversy between Tally Personnel and Liberty and/or Murski regarding each party's rights and interests in connection with a pending patent application and any and all related applications that have been filed or will be filed based on ideas conceived of by Murski while employed by Tally or using the Tally Trade secrets and/or propriety and confidential information (the "Disputed Patent Application").

115.     As a result of the conduct and events set forth individually and collectively in the preceding paragraphs of this Complaint, Tally possesses legal ownership and/or equitable ownership and/or other interests in the Disputed Patent Application inconsistent with and superior to any interest claimed by Liberty and/or Murski. Tally's ownership and related interests include: (a) legal ownership of the Disputed Patent Application by operation of law including by virtue of the Tally-Murski Agreement; and/or (b) equitable ownership of the Disputed Patent Application including by virtue of Murski's breaches and the above-detailed inequitable scheme on the part of Liberty and Murski.

116.     Tally is entitled to a declaration that the inventions disclosed and claimed in the Disputed Patent Application, and all inventions derived therefrom, were previously assigned or should have been previously assigned to Tally by inventor Murski and/or by Liberty.

117.     Tally further seeks a declaration from this Court pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201, that Tally is the rightful owner of the Disputed Patent Application, all other inventions and patent applications pending worldwide that were derived

34

from the inventions claimed in the Disputed Patent Application, and any other inventions developed by Murski while at Tally using Tally resources. Tally further seeks a declaration that Liberty no longer has any ownership interest in the Disputed Patent Application or the invention or inventions disclosed therein and that Liberty has no rights to use the invention or inventions disclosed therein.

## COUNT IV (MURSKI):
### Breach of Contract

118.     Tally incorporates by reference the allegations in Paragraphs 1-117 above.

119.     The plaintiffs for this claim are Tally Personnel, Tally Production Systems, Epic, and Priority. The defendant for this claim is Murski.

120.     Murski entered into express contractual commitments with Tally Personnel specifically with respect to Tally-Murski Agreement.

121.     Tally Production System, Epic, and Priority are third-party beneficiaries to the Tally-Murski Agreement because their confidential information is provided to Tally Personnel employees and Tally Personnel is obligated to protect that information.

122.     Under that agreement, Murski had a contractual obligation to "keep the Confidential Information, and all documentation and information relating thereto, strictly confidential." Exhibit 1, at 2. Murski further agreed:

> Employee further agrees that, except as expressly authorized in writing by the Company, or as may be required by law or court order, Employee will never (including during and after employment with the Company): (i) disclose Confidential Information to any third party except as required to perform Employee's duties for the Company and then only for the purpose of furthering the interests of the Company or its affiliates, as applicable; (ii) use Confidential Information for any purpose other than for the benefit of the Company or its affiliates, as applicable; (iii) retain or copy Confidential Information for any reason, except as required to perform Employee's duties for the Company or its affiliates, as applicable; (iv) remove Confidential information from the Company's premises except as required to perform Employee's duties for the Company or its affiliates, as applicable, and then only for so long as is required to perform those duties; or

(v) use Confidential Information to solicit any of the Company's former, current, or prospective customers or to solicit for employment or encourage any other entity to solicit for employment any employee of the Company.

*Id.*

123.    Murski breached his contractual obligations at least by, among other things, "disclos[ing] Confidential information to [a] third party," "us[ing] Confidential Information for [purposes] for the benefit of [Liberty]," and "us[ing] Confidential Information to solicit [Tally's] former, current, or prospective customers." *See generally*, *id.*

124.    The Confidential Information misappropriated by Murski benefited each of Tally Personnel, Tally Production Systems, Epic, and Priority by remaining confidential.

125.    Murski further agreed that "[Murski] will deliver to the Company (and will not keep in his possession or deliver to any other person or organization) any and all Confidential Information and other documents, equipment, or property belonging to the Company." *Id.*, at 3.

126.    On information and belief, Murski kept property of Tally after his employment with Tally was terminated, in breach of his obligation, including, without limitation, information regarding Tally's gas lift valves as well as the Tally Excel Bidsheet and possibly the external hard drive.

127.    Murski further agreed that "[Murski] will put the Company's business interests before Employee's business interests for so long as Employee remains employed by the Company." *Id.*, at 1.

128.    On information and belief, Murski misrepresented to Tally, in breach of his obligation, where he was going to be employed after leaving Tally. In doing so, Murski, while employed at Tally, placed his own interests ahead of the interests of Tally.

129.    As a direct and necessary result of Murski's contractual breaches, Tally has been injured in its business or property and is threatened by an imminent loss of profits, loss of

customers and potential customers, and loss of goodwill and product image in a manner that was actually foreseen, or was reasonably foreseeable, by Murski at the time Murski's contractual commitments with Tally were formed.

130.    Tally has suffered and will suffer injury in fact by reason of Murski's unlawful, unfair and fraudulent acts and has lost, and continues to lose, money or property.

<u>**COUNT V (CRANK):**</u>
<u>**Breach of Contract**</u>

131.    Tally incorporates by reference the allegations in Paragraphs 1-130 above.

132.    The plaintiff for this claim is Epic. The defendant for this claim is Crank.

133.    Crank entered into express contractual commitments with Epic specifically with respect to the Epic-Crank Agreement, under that agreement Crank had a contractual obligation to:

> (b) Employee agrees that Employee shall not, either during Employee's employment with Company, any of its subsidiaries or any parent or holding company of Company (Company and each such subsidiary, parent and holding company, a "Related Company" and collectively, the "Related Companies") or at any time thereafter, except as required in the performance of Employee's services for a Related Company, (i) use any Confidential Information in any manner whatsoever, (ii) disclose or divulge any Confidential Information, except to the extent required by law (but only after Employee has provided Company with reasonable notice and opportunity to take legal action against such legally required disclosure) or (iii) remove or aid in the removal from the premises of any Related Company any Confidential Information or any property or material relating thereto.

Exhibit 3, at 1.

134.    Crank breached his contractual obligations at least by, among other things "us[ing] [] Confidential Information" in a manner not "required in the performance of Employee's services for a Related Company." *Id*

135.    As a direct and necessary result of Crank's contractual breaches, Tally has been injured in its business or property and is threatened by an imminent loss of profits, loss of customers and potential customers, and loss of goodwill and product image in a manner that was

actually foreseen, or was reasonably foreseeable, by Crank at the time the Crank's contractual commitments with Tally were formed.

136.    Tally has suffered and will suffer injury in fact by reason of the Individual Defendant's unlawful, unfair, and fraudulent acts and has lost, and continues to lose, money or property.

**COUNT VI (CRANK):**
**Breach of Contract**

137.    Tally incorporates by reference the allegations in Paragraphs 1-136 above.

138.    The plaintiffs for this claim are Tally Personnel, Tally Production Systems, Epic, and Priority. The defendant for this claim is Crank.

139.    Crank entered into express contractual commitments with Tally Personnel specifically with respect to the Tally-Crank Agreement.

140.    Tally Production System, Epic, and Priority are third-party beneficiaries to the Tally-Crank Agreement because their confidential information is provided to Tally Personnel employees and Tally Personnel is obligated to protect that information.

141.    Under that agreement, Crank had a contractual obligation to "keep the Confidential Information, and all documentation and information relating thereto, strictly confidential." Exhibit 2, at 2. Crank further agreed:

> Employee further agrees that, except as expressly authorized in writing by the Company, or as may be required by law or court order, Employee will never (including during and after employment with the Company): (i) disclose Confidential information to any third party except as required to perform Employee's duties for the Company and then only for the purpose of furthering the interests of the Company or its affiliates, as applicable; (ii) use Confidential Information for any purpose other than for the benefit of the Company or its affiliates, as applicable; (iii) retain or copy Confidential Information for any reason, except as required to perform Employee's duties for the Company or its affiliates, as applicable; (iv) remove Confidential information from the Company's premises except as required to perform Employee's duties for the Company or its affiliates, as applicable, and then only for so long as is required to perform those duties; or

(v) use Confidential Information to solicit any of the Company's former, current, or prospective customers or to solicit for employment or encourage any other entity to solicit for employment any employee of the Company.

*Id.*

142.    Crank breached his contractual obligations by, among other things "disclos[ing] Confidential information to [a] third party" and "us[ing] Confidential Information for [purposes] for the benefit of [Liberty]." *Id*.

143.    The Confidential Information misappropriated by Crank benefited each of Tally Personnel, Tally Production Systems, Epic, and Priority by remaining secret and confidential.

144.    Crank further agreed that "Crank will deliver to the Company (and will not keep in his possession or deliver to any other person or organization) any and all Confidential Information and other documents, equipment, or property belonging to the Company." *Id.*, at 3.

145.    On information and belief, Crank kept property of Tally after his employment with Tally was terminated, in breach of his obligation, including, without limitation, information regarding Tally's eCatch systems.

146.    Crank further agreed that "[Crank] will put the Company's business interests before Employee's business interests for so long as Employee remains employed by the Company." *Id.*, at 1.

147.    On information and belief, Crank breached his obligation by preparing to compete with Tally while he was still a Tally employee, including for example, by sharing with Supplier A information about the flaws in the first generation of Supplier A's eCatch system.

148.    As a direct and necessary result of Crank's contractual breaches, Tally has been injured in its business or property and is threatened by an imminent loss of profits, loss of customers and potential customers, and loss of goodwill and product image in a manner that was

actually foreseen, or was reasonably foreseeable, by Crank at the time Crank's contractual commitments with Tally were formed.

149.    Tally has suffered and will suffer injury in fact by reason of Crank's unlawful, unfair, and fraudulent acts and has lost, and continues to lose, money or property.

**COUNT VII (MURSKI):**
**Fraud**

150.    Tally incorporates by reference the allegations in Paragraphs 1-149 above.

151.    The plaintiff for this claim is Tally Personnel. The defendant for this claim is Murski.

152.    Murski knowingly, or recklessly and without regard to its truth, made a false representation to Tally Personnel that following his resignation from Tally he would leave the oilfield and return to College Station, Texas to work in a family business. Murski knew that absent such a promise, Tally Personnel would not have continued his employment past his June 17 resignation date, nor allowed him to complete his employment unsupervised at his home or retain his Tally-issued computer while completing his employment—especially not if Tally were aware of Murski's intent to work for Liberty, a direct competitor to Tally. Murski thus intended to induce, and did induce, Tally Personnel to rely on Murski's false promise.

153.    In reliance upon Murski's representation that he would leave the oilfield and work for a family business in College Station, Texas, Tally Personnel continued to pay Murski for his work until July 1, 2022, paid out his accrued Paid Time Off ("PTO"), and allowed him to complete his employment unsupervised at his home using his Tally-issued computer. If Tally Personnel had known that Murski would not live up to his promise, Tally's would have made different decisions regarding at least Murski's termination date, supervision, and accrued PTO. On information and

belief, Murski deleted files from his computer during his extended period of employment, causing further damage to Tally.

154.    On information and belief, Murski's promise to Tally Personnel was a misrepresentation that Murski knew was false at the time it was made. Murski's misrepresentation was material, false, and Murski knew his promise and representation was intended to induce Tally Personnel to continue to employ him until July 1, 2022 (and thus pay him for his time) and to allow him continued access to his Tally-issued computer. Tally Personnel actually and justifiably relied on Murski's promise and misrepresentation, to its detriment and injury.

155.    As a result of Murski's false promise and fraudulent conduct, and Tally Personnel's reasonable reliance on these promises, Tally Personnel has been injured in its business or property. For example, Tally paid Murski compensation that it would not have had Murski been truthful, and on information and belief, the extra time employed by Tally allowed Murski to delete computer files that he would not have been able to delete.

## COUNT VIII (MURSKI AND LIBERTY):
### Tortious Interference with Contract

156.    Tally incorporates by reference the allegations in Paragraphs 1-155 above.

157.    The plaintiffs for this claim are Tally Personnel, Tally Production System, Epic, and Priority. The defendants for this claim are Murski and Liberty .

158.    Tally has contractual relationships with its customers to provide artificial lift products and services.

159.    With actual knowledge of the contractual relationship, Murski, on behalf of Liberty, disparaged Tally to its customers using the Tally Trade Secrets.

160.     Such inequitable contact proximately caused Tally's injuries by, at a minimum, harming Tally's reputation with its customers and causing at least one customer to move business from Tally to Liberty.

161.     Such interference has caused actual damages to Tally in the form of lost sales.

### COUNT IX (MURSKI):
### Texas Harmful Access by Computer

162.     Tally incorporates by reference the allegations in Paragraphs 1-161 above.

163.     The plaintiffs for this claim are Tally Personnel, Tally Production Systems, Epic, and Priority. The defendant for this claim is Murski.

164.     Murski has violated Section 33.02 of the Texas Penal Code to the harm of Tally.

165.     On information belief, Murski knowingly and intentionally accessed a computer, computer network, or computer system without the effective consent of the owners, Tally, in violation of Section 33.02 of the Texas Penal Code at least by deleting customer install sheets from Murski's Tally-issued computer.

166.     Tally has been injured by Murski's knowing and intentional access to Tally's computers, computer networks, and computer systems without consent, as Tally has had to incur and will likely incur future significant costs in (a) assessing the potential damage to Tally that has been caused by the Defendants' unauthorized access, use, and misappropriation; (b) responding to the loss of trade secrets, confidential information, and protected data caused by Murski's actions; and (c) mitigating the loss of goodwill among Tally's customers that has resulted from Murski's unauthorized use, access, and misappropriation. Tally has also been injured by the reduction in Tally's competitive advantages and the effect of Murski's unauthorized access on Tally's ability to compete effectively in the marketplace.

167.     Pursuant to Texas Civil Practice & Remedies Code Section 143.002(a), Tally is entitled to recover its actual damages for injuries caused by Murski's knowing and intentional access to Tally's computer, computer network, or computer system without consent.

168.     Pursuant to Texas Civil Practice & Remedies Code Section 143.002(b), Tally is also entitled to recover its reasonable attorneys' fees and costs for bringing this cause of action.

169.     Murski's conduct has caused and is causing irreparable injury to Tally and, unless enjoined by this Court, will continue to do so.

## COUNT X (LIBERTY): ##
### False Advertising ###

170.     Tally incorporates by reference the allegations in Paragraphs 1-169 above.

171.     The plaintiffs for this claim are Tally Production Systems, Epic, and Priority. The defendant for this claim is Liberty.

172.     Liberty is offering for sale, selling, and marketing an auto catch product, the "LE-Catch Liberty Electric Actuator for Auto-Catch," that competes with Tally's auto catch product, the Tally EAC. Both Liberty's and Tally's products are sold in interstate commerce.

173.     Liberty's use and continued use in commerce of images, words, terms, names, and misleading representations of fact in connection with Liberty's sale and promotion of Liberty's "LE-Catch Liberty Electric Actuator for Auto-Catch" product is likely to cause confusion, mistake, or deception as to the sponsorship or approval of Defendant's product with or by Tally. For example, Liberty's unauthorized use in commerce of images of Tally's lubricator product on or in connection with Liberty's "LE-Catch Liberty Electric Actuator for Auto-Catch" product is likely to mislead consumers into believing Tally sponsors or approves of Liberty's design and directly affects Tally's sales of its own Tally EAC product.

174.    On information and belief, Liberty is aware that the lubricator shown in the 2024 PDF is a Tally lubricator, and thus its misrepresentation is willful and made in bad faith.

175.    On information and belief, Liberty's actions were taken with knowledge and with the intent to cause confusion or mistake and to deceive the public as to the sponsorship or approval of Liberty's products by Tally, particularly considering Liberty's prior knowledge of the Tally products given its employment of the Individual Defendants.

176.    As a direct and proximate result of Liberty's acts, Tally has suffered injury, including loss of exclusive control over the use of images of its products and damage to the value of its reputation and goodwill.

177.    This injury to Tally is irreparable. Liberty continues to commit the acts described above, and unless restrained and enjoined, will continue to do so, to Tally's further irreparable injury. Tally's remedy at law is inadequate to compensate it for the injuries inflicted and threatened by Liberty.

### Count XI (LIBERTY)
### False Designation of Origin

178.    Tally incorporates by reference the allegations in Paragraphs 1-177 above.

179.    The plaintiffs for this claim are Tally Production Systems, Epic, and Priority. The defendant for this claim is Liberty.

180.    Liberty is offering for sale, selling, and marketing an auto catch product, the "LE-Catch Liberty Electric Actuator for Auto-Catch," that competes with Tally's auto catch product, the Tally EAC. Both Liberty's and Tally's products are sold in interstate commerce.

181.    Liberty's use and continued use in commerce of images, words, terms, names, and misleading representations of fact in connection with Liberty's sale and promotion of Liberty's "LE-Catch Liberty Electric Actuator for Auto-Catch" product is likely to cause confusion, mistake,

or deception as to the origin or source of Defendant's product. For example, Liberty's unauthorized use in commerce of images of Tally's lubricator product on or in connection with Liberty's "LE-Catch Liberty Electric Actuator for Auto-Catch" product is likely to mislead consumers into believing that Liberty's "LE-Catch Liberty Electric Actuator for Auto-Catch" comes from Tally. As another example, Liberty's use of the picture of the e-Catch system with Liberty labeling is likely to mislead consumers to believe that the e-Catch system illustrated is a Liberty product.

182.    On information and belief, Liberty is aware that the lubricator shown in the 2024 PDF is a Tally lubricator, and thus its misrepresentation is willful and made in bad faith.

183.    On information and belief, Liberty's actions were taken with knowledge and with the intent to cause confusion or mistake and to deceive the public as to the sponsorship or approval of Liberty's products by Tally, particularly considering Liberty's prior knowledge of the Tally products given its employment of the Individual Defendants.

184.    As a direct and proximate result of Liberty's acts, Tally has suffered injury, including loss of exclusive control over the use of images of its products and damage to the value of its reputation and goodwill.

185.    This injury to Tally is irreparable. Liberty continues to commit the acts described above, and unless restrained and enjoined, will continue to do so, to Tally's further irreparable injury. Tally's remedy at law is inadequate to compensate it for the injuries inflicted and threatened by Liberty.

## COUNT XII (LIBERTY):
### Unjust Enrichment

186.    Tally incorporates by reference the allegations in Paragraphs 1-185 above.

187.    The plaintiffs for this claim are Tally Production Systems, Epic, and Priority. The defendant for this claim is Liberty.

188.     Liberty has made unjust profits from the sale of its artificial lift systems by improperly trading on and using the property of Tally—including its confidential information, software (*e.g.*, the Tally Excel Bidsheet),  and pictures of Tally products.

189.     Defendants' conduct and actions set forth above constitute unjust enrichment under the Common Law of Texas.

190.     Tally is entitled to a disgorgement of the unjust profits made by Liberty.

## JURY DEMAND

191.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for:

A.     A judgment that Defendants have committed trade secret misappropriation in violation of the DTSA, 18 U.S.C. § 1836;

B.     A judgment that Defendants' trade secret misappropriation in violation of the DTSA, 18 U.S.C. § 1836 has been willful and malicious;

C.     An award of monetary damages under 18 U.S.C. § 1836 to Tally for Defendants' misappropriation of Tally's trade secret information, including but not limited to damages for actual loss caused by the misappropriation, damages for unjust enrichment caused by the misappropriation, or in the alternative a reasonable royalty;

D.     An award of exemplary damages under 18 U.S.C. § 1836 to Tally for Defendants' willful and malicious misappropriation of Tally's trade secret information;

E.      A judgment that Defendants have committed trade secret misappropriation in violation of the Texas Uniform Trade Secret Act, Tex. Civ. Prac. & Rem. Code §§ 134A.001 et seq.;

F.      A judgment that Defendants' trade secret misappropriation in violation of the Texas Uniform Trade Secret Act, Tex. Civ. Prac. & Rem. Code §§ 134A.001 et seq. has been willful and malicious;

G.      An award of monetary damages under Tex. Civ. Prac. & Rem. Code §§ 35 134A.001 et seq. to Tally for Defendants' misappropriation of Tally's trade secret information, including but not limited to damages for actual loss caused by the misappropriation, damages for unjust enrichment caused by the misappropriation, or in the alternative a reasonable royalty;

H.      An award of exemplary damages under Tex. Civ. Prac. & Rem. Code §§ 134A.001 et seq. to Tally for Defendants' willful and malicious misappropriation of Tally's trade secret information;

I.      An injunction enjoining Defendants from continuing to use, possess, or disclose the Tally Trade Secrets;

J.      An order for an accounting and report by Defendants of all Tally's trade secret information or material of any type in Defendants' possession;

K.      An order for the return to Tally of all Tally's trade secret information and all Tally material that contains trade secret information in Defendants' possession;

L.      Judgment that Tally owns all right, title, and interest to the invention or inventions disclosed and claimed in the Disputed Patent Application, all inventions derived therefrom, and any patent, continuation patent, or divisional patent that may issue therefrom;

M.     Judgment that Murski and Liberty must make a full and complete disclosure to Tally of the invention or inventions disclosed in the Disputed Patent Application;

N.     Judgment that Murski and Liberty must assign to Tally all of their right, title, and interest in the Disputed Patent Application, and any patents issuing from such applications and all worldwide right, title and interest to the invention disclosed therein and/or imposition of a constructive trust in favor of Tally;

O.     An injunction enjoining Defendants and those persons in active concert with them, against employing the methods or from making, using, offering to sell, selling, or importing into the United States the apparatus claimed in the Disputed Patent Application as of the issue date of any patent which issues from such applications;

P.     Judgment that Murski breached the Tally-Murski Agreement;

Q.     Judgment that Crank breached the Epic-Crank Agreement;

R.     Judgment that Crank breached the Tally-Crank Agreement;

S.     An award of monetary damages adequate to compensate Tally for Murski's and Crank's breaches of the Tally-Murski Agreement, Epic-Crank Agreement, and Tally-Crank Agreement;

T.     An injunction enjoining Defendants against further breaches of their contractual obligations to Tally;

U.     A judgment that Defendants Murski and Liberty tortiously interfered with Tally's contractual relationship with its customers and an award of damages thereon;

V.     An injunction enjoining Defendants against further tortious interference with Tally's contractual relationship with its customers;

W.      Judgement that Murski has violated the Texas Harmful Access by Computer Act under Tex. Civ. Prac. & Rem. Code § 143 *et seq*.;

X.      An award of monetary damages under Texas Civil Practice & Remedies Code Section 143.002(a) for Murski's violation of Texas Harmful Access by Computer Act;

Y.      An award of attorneys' fees under Texas Civil Practice & Remedies Code Section 143.002(b) for Murski's violation of Texas Harmful Access by Computer Act;

Z.      Judgment that Murski committed the tort of fraud;

AA.     An award of general and special damages for Murski's fraud;

BB.     Judgment that Liberty violated the Lanham Act 15 U.S.C. 1125 by falsely advertising its "LE-Catch Liberty Electric Actuator for Auto-Catch" product;

CC.     An award of monetary damages to Tally for Liberty's false advertising related to its "LE-Catch Liberty Electric Actuator for Auto-Catch" product;

DD.     An award of treble damages to Tally for Liberty's false designation of origin for its "LE-Catch Liberty Electric Actuator for Auto-Catch" product;

EE.     An injunction enjoining Liberty from continuing to falsely advertise its "LE-Catch Liberty Electric Actuator for Auto-Catch" product;

FF.     Judgment that Liberty violated the Lanham Act 15 U.S.C. 1125 by falsely designating the origin of its "LE-Catch Liberty Electric Actuator for Auto-Catch" product;

GG.     An award of monetary damages to Tally for Liberty's false designation of origin for its "LE-Catch Liberty Electric Actuator for Auto-Catch" product;

HH.     An award of treble damages to Tally for Liberty's false designation of origin for its "LE-Catch Liberty Electric Actuator for Auto-Catch" product;

II.     An injunction enjoining Liberty from continuing to falsely designate the origin of its "LE-Catch Liberty Electric Actuator for Auto-Catch" product.

JJ.     A disgorgement of profits for Liberty's unjust enrichment;

KK.     An order awarding Tally prejudgment and post-judgment interest on its damages;

LL.     An order awarding Tally its costs;

MM.     An order awarding Tally its attorneys fees; and

NN.     Such other and further relief as this Court deems just and proper.

Dated:  June 26, 2024

Respectfully submitted,

OF COUNSEL:

BAKER BOTTS L.L.P.

Amy Pharr Hefley
Texas Bar No. 24046046
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, Texas 77002-4995
Telephone:  (713) 229-1234
Facsimile:  (713) 229-1522
amy.hefley@bakerbotts.com

By: */s/Danny David*
Danny David
Attorney-in-Charge
Texas Bar No. 24028267
910 Louisiana Street
Houston, Texas 77002-4995
Telephone:  (713) 229-1234
Facsimile:  (713) 229-1522
danny.david@bakerbotts.com

David Wille (*pro hac vice* pending)
Texas Bar No. 785250
Matthew Chuning (*pro hac vice* pending)
Texas Bar No. 24121538
BAKER BOTTS L.L.P.
2001 Ross Avenue, Suite 900
Dallas, Texas 75201
Telephone: (214) 953-6595
Facsimile: (214) 953-4595
david.wille@bakerbotts.com
matthew.chuning@bakerbotts.com

Nischay K. Bhan
Texas Bar No. 24105468
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York City, New York 10112-4498
Telephone: (212) 408-2500
Facsimile: (212) 408-2501
nischay.bhan@bakerbotts.com

*Attorneys for Plaintiffs*